Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 6850 | **DATE** | 7/25/2000 |
| **CASE TITLE** | Industrial Enclosure vs. Northern Insurance | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth on the attached order, plaintiff's motion for partial summary judgment (43-1) is denied, and defendant Maryland's motion for summary judgment (45-1) is also denied.

(11) ■ [For further detail see order attached to the original minute order.]

| ✓ | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | JUL 2 6 2000 | |
| | Notified counsel by telephone. | | date docketed | 57 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | 00 JUL 25 PM 5: 11 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| INDUSTRIAL ENCLOSURE CORP., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> NORTHERN INSURANCE CO. OF NEW ) <br> YORK and MARYLAND CASUALTY CO., ) <br> ) <br> Defendants. ) | Case No. 97 C 6850 |

DOCKETED
JUL 2 6 2000

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On July 17-18, 1996, the interior of plaintiff Industrial Enclosure Corporation's manufacturing plant located in Aurora, Illinois was inundated with water, causing severe damage. IEC made a claim on its insurance policy issued by defendant Northern Insurance Company of New York, but Northern denied coverage, claiming that the loss was within a policy exclusion. IEC has sued Northern for breach of contract and has also sued Maryland Casualty Company, which owns Northern, for consumer fraud in connection with its agent's sale of the policy to IEC. IEC has moved for summary judgment on the issue of liability on its claim against Northern, and Maryland has moved for summary judgment on IEC's consumer fraud claim. For the reasons stated below, the Court denies both parties' motions.

### Facts

IEC is engaged in the design and construction of steel containers and boxes for electrical systems and controls. Its Aurora plant is located to the south of Indian Creek and west of the

South Tributary of Indian Creek, just southwest of the point where the Tributary joins the Creek. Just across the South Tributary, to the east, is a building owned by JB Industries, a fact we cite for reasons that shortly will become clear.

On July 18, employees of IEC discovered that the exterior and interior of the plant were inundated by three to four feet of water. There was severe damage to the interior of the plant; IEC says its losses, including lost income, exceeded $2 million. It made a claim for these losses on an insurance policy issued by Northern. The policy provided that losses were covered unless subject to a policy exclusion or limitation. PX 1B, ¶A. Among the exclusions were the following:

> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss of damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
> . . .
>
> g. Water
>
> > (1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

PX 1B, ¶1.g. Another part of the same section excluded damage from "[w]ater that backs up or overflows from a sewer, drain or sump," but that exclusion was deleted by another provision of the policy. *See* PX 1B, ¶1.g.(3); PX 1C, §B.1.e.

IEC claims that the damage to its plant was caused by backup or overflow from sewers and drains and that its losses are therefore covered under the policy. Northern has asserted as an affirmative defense that flood and surface water caused or contributed to the damage to the interior of IEC's facility.

2

## IEC's motion for summary judgment

Assuming IEC can establish a *prima facie* case of coverage under the policy, Northern bears the burden of proving that the loss is excluded. *See, e.g., Economy Fire & Casualty Co. v. Bassett,* 170 Ill. App. 3d 765, 769, 525 N.E.2d 539, 541 (1988). IEC argues that Northern cannot carry its burden of proof. According to IEC, Northern's evidence supporting its defense consists of the testimony of Northern's retained expert, Gerald Robinson. Robinson says that sewer and drain backup was not the exclusive cause of the damage inside IEC's plant and that the damage was caused, in significant part, by water that came from outside the plant. According to Robinson, water from the rainfall first overflowed the South Tributary and inundated the JB Industries building, located east of the South Tributary. The accumulation of water, however, became too much for the JB building's walls to handle, and eventually the building's west wall collapsed. This, Robinson says, "released a large volume of water in a very short period of time (similar to a dam breach)." Robinson maintains that this water flowed in a westerly direction, back toward the South Tributary, but that it overwhelmed the Tributary's capacity to carry water to Indian Creek; the water "overtopped the western bank of the South Tributary . . . and proceeded westward to the IEC facility." These waters, Robinson says, caused or contributed to the damage inside the IEC plant.

IEC argues that Robinson's testimony should be excluded pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) – which, IEC claims, would leave Northern without support for its defense. IEC also argues that even if Robinson's testimony is accepted, it demonstrates that the damage did not result from a "flood" within the meaning of the exclusion – which IEC claims should be construed favorably to IEC because it is ambiguous.

3

1. **Admissibility of Robinson's testimony**

*Daubert* held that "reliability is the touchstone for expert testimony based on 'scientific, technical, or other specialized knowledge,'" *Elliott v. CFTC,* 202 F.3d 926, 933 (7th Cir. 2000) (quoting Fed. R. Evid. 702), and that such testimony, to be admitted, "must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." *Daubert,* 509 U.S. at 590. The trial court acts as the gatekeeper for proposed expert testimony and in serving this role must make a twofold inquiry: whether the expert's testimony is based on a reliable methodology, and whether the testimony will assist the fact finder in understanding the evidence or in determining a fact in issue. *See Clark v. Takata Corp.,* 192 F.3d 750, 756-57 (7th Cir. 1999).[1]

IEC does not challenge Robinson's qualifications; he appears to have extensive experience in civil and water resources engineering, including in the area of flood control and storm water management. IEC likewise does not challenge the relevance (helpfulness to the jury) of Robinson's testimony. Rather, IEC contends that Robinson's opinion that the damage was caused or contributed to by water from outside the building, as opposed to sewer or drain backup, is not supported by the facts. A court can exclude an expert opinion if it is a naked conclusion or represents unsupported speculation, *see McMahon v. Bunn-O-Matic Corp.,* 150

---

[1] *Daubert* set forth a non-exhaustive list of four factors that are helpful in gauging the reliability of expert testimony: (1) whether the theory is scientific knowledge that will assist the trier of fact and can be tested; (2) whether the theory has been subjected to peer review or publication; (3) the known or potential rate of error and the existence of standards controlling the technique's operation; and (4) the extent to which the methodology or technique employed by the expert is generally accepted in the scientific community. *Daubert,* 509 U.S. at 593-94. IEC does not address any of these factors, instead focusing on whether Robinson's conclusions are sufficiently supported by the facts he cites.

F.3d 651, 658 (7th Cir. 1998); *Ancho v. Pentek Corp.*, 157 F.3d 512, 515 (7th Cir. 1998), or if it is based on unwarranted or implausible assumptions or is "connected to existing data only by the *ipse dixit* of the expert." *Target Market Publishing, Inc. v. Advo, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998).

Robinson's conclusion that the damage was caused by water that came from the JB building is based on several factors. He says, among other things, that there were doors, windows, and holes in the metal siding of IEC's building through which water could enter; that overflow from the wastewater pipe connected to the building (which IEC's experts say was the source of the internal flooding) could not have supplied all the water that was found inside the building; and that the depth of internal flooding was consistent with the depth of external flooding.

According to IEC, Robinson's contention that flood or surface water entered IEC from the outside in sufficient volume to cause damage is without support, as he made no calculations to support the proposition that sufficient water could have leaked through windows and doors or holes in the sheet metal walls. Robinson does not specify how much water he thinks entered the building from the outside or exactly where he thinks it came in.

Causation, like most other facts, can be proved either directly or indirectly. Robinson's opinion appears to rely in part on the indirect method – he will try to establish that external water was a cause of the flooding by showing that backup from sewers and drain pipes could not possibly have been the sole cause. IEC's objection seems to be based primarily on the proposition that Robinson's opinion is lacking in direct proof; it objects that Robinson has not demonstrated that enough water could have come through the doors, windows, and walls to cause

5

the internal flooding. But the Court cannot say that is the only reliable way for Northern to prove its contentions. If, as Robinson contends, the "internal" sources could not account for all of the water inside the building – a conclusion that IEC does not attack on *Daubert* grounds – then a reasonable person could conclude that some of the water had to come from external sources. Under the policy exclusion, Northern need not show that the internal damage was caused *exclusively* by flood or surface water; the language of the exclusion bars coverage even if those sources *contributed* to the damage. Robinson's methodology is an acceptable way of reaching such a conclusion. His failure to make calculations may bear on the believability of his opinion and the weight to be given to it, but it is not a basis to exclude his opinion entirely.

## 2.   Cause of damage by "flood"

IEC argues that even if Robinson's testimony is admissible, and even if it is taken as true, it is insufficient to carry Northern's burden of proving that the interior damage to IEC's plant was caused by a flood within the meaning of the policy exclusion. According to IEC, if the loss was caused by water that came from the JB building, that was not a flood, as it was not the result of a natural overflow of a water course. IEC appears to contend that Robinson's testimony establishes that the water that flowed into the JB building would not have flowed toward the IEC building in the normal course of a flood and that the collapse of the JB building's west wall caused a redirection of the water toward the IEC building.

The construction of an insurance policy and its exclusions is a question of law. *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 529, 655 N.E.2d 842, 846 (1995). A policy provision is ambiguous only if it is subject to more than one reasonable interpretation. *Id.* at 530, 655 N.E.2d at 846; *United States Fidelity & Guaranty Co. v. Wilkin*

6

*Insulation Co.*, 144 Ill.2d 64, 74, 578 N.E.2d 926 (1991). The term "flood" is not defined in the policy, but that does not make the term ambiguous. *Lapham-Hickey*, 166 Ill. 2d at 529, 655 N.E.2d at 846. And a court cannot read an ambiguity into a policy just to find in favor of the insured. *Id.*

The term "flood" has a common and accepted meaning. As the court held in *Wallis v. Country Mutual Insurance Co.*, 309 Ill. App. 3d 566, 723 N.E.2d 376 (2000), the commonly understood definition of a flood is "'a rising and overflowing of a body of water that covers land not usu[ally] under water.'" *Id.* at 572, 723 N.E.2d at 381 (quoting Webster's Third New International Dictionary 873 (1993). "Water from a flood is termed 'floodwater' which means, '[w]ater that escapes from a watercourse in large volumes and flows over adjoining property in no regular channel.'" *Id.* (quoting Black's Law Dictionary 1585 (7th ed. 1999)).

The Court does not believe that this term is reasonably susceptible of more than one interpretation. IEC cites only one case holding that the term is ambiguous. That decision, *Ferndale Development Co. v. Great American Insurance Co.*, 34 Colo. App. 258, 527 P.2d 939 (1974), was rejected in *Wallis*, which held that the term was unambiguous, *see Wallis*, 309 Ill. App. 3d at 571-74, 723 N.E.2d at 381-83, and *Ferndale* has been limited by later developments in Colorado law. *See Kane v. Royal Insurance Co. of America*, 768 P.2d 678, 681 (Colo. 1989) (holding "flood" to be unambiguous). Though there may be circumstances in which "flood" may be considered ambiguous as applied to a particular fact pattern, *see Wallis*, 309 Ill. App. 3d at 574, 723 N.E.2d at 383, this is not such a situation, for the reasons explained below. In sum, we reject IEC's argument that the term is ambiguous.

IEC argues that what Robinson says happened to IEC's plant was not a flood no matter

7

what the definition of the term. Its argument is not all that different from the one made by the plaintiffs in *Wallis*. There a storm (coincidentally the same one that precipitated the events in this case) caused a man-made irrigation channel adjoining the plaintiffs' property to overflow; the resulting flow of water inundated their house. The insurance policy excluded losses from "water damage," including that caused by "flood, surface water (including water flowing naturally on or near the surface and water whose flow is artificially altered), waves, tidal water, overflow of a body of water, or spray from any of these . . . ." *Wallis*, 309 Ill. App. 3d at 568, 723 N.E.2d at 379. The plaintiffs argued that the term "flood" extended only to the overflow of a natural body of water, not a man-made watercourse like the irrigation channel. *Id.* at 571-72, 723 N.E.2d at 381. The court rejected this argument, holding that the plain meaning of "flood" includes the escape of water from any watercourse so that it flows over adjoining property in no regular channel, ending up in an area where it would not normally be expected. *Id.* at 574, 723 N.E.2d at 383.

IEC contends that if what Robinson says is correct, the water that inundated its plant came not from a flooding of the South Tributary but rather from a release of water from the JB building. This, IEC says, was not a flood within the meaning of the exclusion. The Court disagrees. What Robinson says is that when the water escaped from the JB building upon collapse of the wall, it flowed first to the South Tributary (which is between the JB building and the IEC plant) and then overwhelmed the Tributary, overflowing its western bank and continuing westward to the IEC building. In other words, the water *did* overflow a natural water course, namely the South Tributary. The fact that the water's most recent location prior to that was an artificial structure – the JB building – does not affect whether it constituted a flood.

8

The Court considers the Colorado Supreme Court's decision in *Kane v. Royal Insurance Co. of America*, 768 P.2d 678 (Colo. 1989), cited by Northern, to be particularly persuasive on this point. In *Kane*, the overflow of a river caused a dam to fail, releasing a large amount of water, causing damage to the plaintiffs' property. The plaintiffs sought a declaration of coverage under their insurance policy, which excluded from coverage losses caused by "flood, surface water, waves, tidal water or tidal waves, overflow of streams and other bodies of water, or spray from any of the foregoing." *Id.* at 680. The plaintiffs argued that the failure of the dam was an artificially-caused flood and that the policy exclusion applied only to damage caused by natural floods. *Id.* The court disagreed, holding that the term "flood" was not ambiguous and meant, quite simply, an overflowing of water on an area normally dry. *Id.* at 681. That being the case, the damage to plaintiffs' property was within the scope of the exclusion, even if artificially caused. *Id.* at 682-83. The court declined to "force an ambiguity [in the insurance policy] in order to resolve it against the insurer," *id.* at 683, and it held that the damage was excluded by the policy. If what happened in *Kane* was a flood, what Robinson says happened here likewise may be appropriately termed a flood.

IEC also appears to contend that if the regular flow of a flood (i.e., the flow of water into the JB building in the first place) is diverted in some way, and damage results from that diversion, then the damage was not caused by a flood within the meaning of the policy exclusion. In *Heller v. Fire Insurance Exchange*, 800 P.2d 1006 (Colo. 1990), the court considered a policy exclusion barring coverage for losses from "[w]ater damage, meaning . . . flood, surface water, waves . . . ." Water from spring runoff from melted snow caused damage to the plaintiffs' property; the insurer claimed that this was "surface water" and thus subject to the exclusion. The

9

evidence, however, showed that the regular path of the water had been diverted onto the plaintiffs' property by several man-made trenches that redirected its course. The court held that "the runoff lost its character as surface water when it was diverted by the trenches and therefore was not within the surface water exclusion." *Id.* at 1009. Similarly, in *Georgetowne Square v. United States Fidelity and Guaranty Co.*, 3 Neb. App. 49, 523 N.W.2d 380 (1994), the court held that an exclusion for losses caused by "surface water" or "runoff" did not bar recovery for damage that resulted from overflow of water from an underground drainage pipe in which surface water and runoff was collected. Though the water had been "surface water" and/or "runoff" to begin with, the court concluded, this ceased to be the case when the water was collected in the underground pipe; it held that "the terms as used in the policy are restricted to surface waters and runoff waters which flow naturally." *Id.* at 55-58, 523 N.E.2d at 385-86.

These decisions, which do not involve construction of the term "flood," are not persuasive here. Surface water, by definition, stops being surface water once it flows into a drain or underground. But a flood does not become something else simply because its source is water that was contained (in its most recent form) in an artificial structure. Nothing in Robinson's expected testimony indicates that the floodwaters that inundated IEC's property were diverted by any human or mechanical intervention. Under the circumstances, the fact that the inundation of IEC's plant might have followed from the collapse of the JB building's wall does not undermine Northern's reliance on the policy exclusion.

For these reasons, the Court denies IEC's motion for summary judgment.

10

## Maryland's motion for summary judgment

IEC purchased its insurance policy through Marc Toral, who it claims served as an agent for Chubb Insurance from 1992 through 1995 and for defendant Maryland Casualty Company, Northern's parent, in 1996. In its complaint, IEC contended that Maryland engaged in deceptive practices in violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2, by selling IEC a policy that was effectively illusory, as it covered losses caused by sewer back-up but excluded losses caused directly or indirectly by flood and surface water, supposedly the most common causes of sewer back-up; by using a policy form with what IEC claims are ambiguous terms ("flood" and "surface water") without defining or explaining those terms; by failing to deliver the actual policy to IEC within a reasonable time after coverage was bound; and by using an "additional coverage endorsement" that was not tailored to IEC's needs and did not reference the flood and surface water exclusions. Second Amended Complaint ¶29(a)-(f). In its response to Maryland's summary judgment motion, however, IEC has focused its claim more narrowly. It argues that "the presence of 'surface water' in the policy exclusions, under the particular facts of this case, is the deception that gives rise to IEC's right to recover under the [ICFA]," IEC Mem. at 2. It contends that this exclusion was contrary to its expectations, *see id.* at 10-11, and that it would not have purchased the policy had it known that the exclusion was present and could or would negate the sewer and drain back-up coverage. *See id.* at 5.

In deciding a motion for summary judgment, the Court's task is to determine whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making this determination, we construe the evidence in the light most favorable to IEC, the non-moving party, and draw reasonable inferences in IEC's

11

favor. *E.g., DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987).

IEC has submitted an affidavit from John Palmer, its president and principal shareholder, who dealt with Toral in connection with IEC's purchase of insurance. Palmer says that in 1992, Toral asked if the plant had any problems with flooding or with water entering the plant. Palmer says he told Toral that the only nearby body of water was Indian Creek and that he had no reason to believe that the plant would ever be flooded by water from the creek.[2] He told Toral that "the only problem we ever had with water was during heavy rainfalls when rainwater would on occasion enter the truck docks on the east and south sides of the building and overflow into the plant during work hours when the doors are left open" and that "water would back into the building through sewers, floor drains, toilets and sinks during periods of heavy rainfall." He says that Toral told him that these problems could be covered by obtaining insurance against backup of sewers and drains.

The Chubb insurance policies that IEC purchased through Toral from 1992 through 1995 all covered sewer and drain back-up, and all of them contained exclusions for losses caused by flood[3]; Palmer says he understood these policies to cover the risks that he had discussed with Toral. None of the Chubb policies, however, contained exclusions for losses caused by surface

---

[2] Palmer's discussion with Toral appears to have involved Indian Creek itself, and not the South Tributary.

[3] The Chubb policies for 1992, 1993, and 1994 defined "flood" as "waves, tidal water or tidal waves, rising, overflowing or breaking of boundaries of lakes, reservoirs, rivers, streams, or other bodies of water, whether driven by wind or not." The 1995 policy defined "flood" as "waves, tidal water or tidal waves; or rising or overflowing or breaking of any boundary of natural or man-made lakes, reservoirs, ponds, brooks, rivers, streams, harbors, oceans or any other body of water, or watercourse, whether driven by wind or not," that directly or indirectly contributed to or worsened a loss.

12

water. The first such exclusion came in the 1996 Northern policy.

In their discussions concerning the placement of IEC's insurance in 1996, Palmer says, Toral suggested that IEC consider placing its insurance with Maryland. He sent Palmer a Maryland advertisement entitled "Manufacturer's ACE" (which stood for "additional coverage endorsement") which specifically stated that sewer and drain back-up was included; it gave no indication that the sewer and drain back-up coverage would be negated if surface water contributed to the loss. According to Palmer, Toral did not tell him that the Maryland policy contained an exclusion for surface water; he says that in light of his concerns about IEC's past problems with water, he would not have purchased the policy had he known of the exclusion.

Palmer says that in late May or early June 1996, he authorized Toral to obtain insurance from Maryland. He received from Toral's agency a binder describing, in very general terms, the types of coverage that was included; it contained no description of any exclusions but did say that "[t]he insurance is subject to the terms, conditions and limitations of the policy(ies) in current use by the Company." Palmer says he did not receive the Northern policy until July 31, 1996, after the loss involved in this case had taken place. Palmer claims that if he had gotten the policy before the July 17 rainstorm, he would have arranged for an amendment to eliminate the surface water exclusion or would have rejected the policy if no amendment was available.

To sustain a claim under the ICFA, the plaintiff must demonstrate that the defendant: (1) misrepresented or concealed a material fact; (2) in the course of a trade or business; (3) with the intention that the plaintiff rely on the misrepresentation or concealment. *See, e.g., Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 501, 675 N.E.2d 584, 593 (1996).

As indicated above, IEC's claim is focused on the fact that the Northern policy contained

an exclusion for losses caused by surface water. It is unclear to the Court whether this exclusion has any real significance here; it appears as though Northern is relying primarily on the flood exclusion, not the surface water exclusion. The Court also has no idea whether Northern is actually intending to take the position that IEC says renders the policy deceptive: that the surface water exclusion negates the sewer and drain back-up coverage if and when the back-up results from overcharging of sewers or drains by surface water. But Maryland does not seek summary judgment on the grounds of lack of materiality or lack of causation of an injury; it argues only that IEC cannot prove misrepresentation or concealment within the meaning of the ICFA.

There does not appear to be any evidence of a deliberate effort on the part of Toral or Maryland to deceive IEC or to actively conceal the existence of a surface water exclusion. Based on the parties' submissions, there is some suggestion that Toral may have been careless in recommending that IEC purchase a policy that he arguably should have known might not cover some of the types of losses that Palmer and IEC were concerned about. It seems incongruous to call this "concealment," let alone "fraud" – terms that imply an intent to deceive. But the Illinois courts have made it clear that a claim under the ICFA is not the equivalent of a common law fraud claim, which requires proof of intent to deceive and, in the case of an omission of material facts, proof that the defendant had a duty to disclose. A plaintiff need not show intent to deceive to sustain an ICFA claim; even an innocent misrepresentation or omission is actionable, so long as it was intended to induce the plaintiff's reliance, *see Cripe v. Leiter*, 184 Ill. 2d 185, 191, 703 N.E.2d 100, 102 (1998); *Mackinac v. Arcadia National Life Insurance Co.*, 271 Ill. App. 3d 138, 141-42, 648 N.E.2d 237, 239-40 (1995), and the defendant is presumed to have intended the necessary consequences of his conduct, *see Totz v. Continental DuPage Acura*, 236 Ill. App. 891,

14

9032, 602 N.E.2d 1374, 1382 (1992). Moreover, "it is unnecessary to plead a common law duty to disclose in order to state a valid claim of consumer fraud based on an omission or concealment." *Connick*, 174 Ill. 2d at 504-05, 675 N.E.2d at 595, citing *Celex Group, Inc. v. Executive Gallery, Inc.*, 877 F. Supp. 1114, 1129 (N.D. Ill. 1995) (Castillo, J.).

Maryland claims that IEC has no evidence that Maryland misrepresented or omitted the fact that the Northern policy contained a surface water exclusion. It is true that there is no evidence of any misrepresentations by Toral, but IEC has offered evidence from which a fact finder could conclude that there was an omission. It contends that Toral knew of IEC's potential surface water problem and that IEC wanted coverage for this; that the Chubb policies had not excluded losses caused wholly or partly by surface water; that the Northern policy contained such an exclusion for the first time; that Toral did not tell IEC of the exclusion and gave IEC brochures that made no reference to the exclusion; and that because the Northern policy was not timely forwarded to IEC, it had no idea that the exclusion existed until after the loss had occurred.

Maryland contends that IEC is charged with notice of the contents of the policy and thus cannot claim to have been deceived. But the cases upon which Maryland relies do not support such a conclusion, at least not in a case like this one. None of the cases that Maryland cites are ICFA cases; all involve claims on insurance policies or common law claims against agents for failure to procure a proper policy. More importantly, in at least two of the cases, the insured actually had the policy before the loss occurred and thus plainly was on notice of its contents but did nothing to remedy the alleged defect. *See Furtak v. Moffett*, 284 Ill. App. 3d 255, 256-57, 671 N.E.2d 827, 829 (1996); *Floral Consultants, Ltd. v. Hanover Insurance Co.*, 128 Ill. App. 3d

15

173, 176, 470 N.E.2d 527, 529 (1984). Here, by contrast, IEC did not get a copy of the policy. The other two cases involved the insureds' failure to make a claim within the time limits imposed by the policy; that is not the type of claim made here, and in any event, in both cases the court indicated that the policy was available to the insured well before he filed his claim. *See Schoonover v. American Family Insurance Co.*, 214 Ill. App. 3d 33, 43, 572 N.E.2d 1258, 1264 (1991); *Florsheim v. Travelers Indemnity Co.*, 75 Ill. App. 3d 298, 307, 393 N.E.2d 1223, 1231 (1979).

In the present case, the Court has no evidence on whether IEC could have obtained the policy sooner; by contrast, the evidence suggests that Maryland / Northern failed to forward the policy to IEC within the normal time this was to be done. And IEC's claim is different from that made by the plaintiffs in the above cases; it argues that it was essentially lulled into believing that its insurance coverage had not changed in any significant way with regard to losses from sewer and drain back-up. There is some evidence to suggest that IEC was on notice that the Northern policy contained limitations, and perhaps it was careless in not trying harder to obtain a copy of the policy so that it could examine these for itself. But this "notice" (contained obliquely in the binder) was sent after IEC had already purchased the policy. Palmer essentially claims that he relied on Toral to obtain proper coverage and had no reason to believe that the policy Toral had recommended was different in any material way from the policies IEC had obtained in the past. On the present record, the Court cannot conclude as a matter of law that IEC was not deceived (even if this was unintentional on Maryland's part).

Maryland argues that it had no idea that IEC had any interest in or need for coverage for damage caused by surface water. This argument, however, is based on a mischaracterization of

16

Palmer's affidavit. Maryland argues that "all [Palmer] apparently discussed with Toral [in 1992] was IEC's desire for sewer and back-up coverage, based upon Palmer's concern about water backing 'into the building through sewers, floor drains, toilets and sinks during periods of heavy rainfall.'" Maryland Reply at 2 (quoting Palmer Aff., ¶4). Later in its reply, Maryland makes the same argument even more categorically, stating that "Palmer claims that he told Toral that *the only water problem IEC had* was when water would back up into the building through sewers, floor drains, toilets and sinks during periods of heavy rainfall." Maryland Reply at 4 (emphasis added). That is not an accurate rendition of Palmer's affidavit. Palmer quite clearly claims (in the selfsame paragraph of the affidavit cited by Maryland) that he told Toral about both a back-up problem *and* a surface water problem, namely "when rainwater would on occasion enter the truck docks on the east and south sides of the building and overflow into the plant during work hours when the doors are left open." *See* Palmer Aff. ¶4.

Finally, IEC contends that selling a policy with what it argues was an ambiguous "flood" exclusion was a deceptive act violative of ICFA. *See* IEC Mem. at 8-9. Even if such conduct would be actionable standing alone (an issue we need not decide), we have already held that the exclusion was not ambiguous.

The Court therefore denies Maryland's summary judgment motion, except insofar as IEC's claim is based on the alleged ambiguity of the "flood" exclusion. IEC cannot maintain an ICFA claim based on that assertion.

### Conclusion

For the reasons stated above, plaintiff's motion for partial summary judgment [43-1] is

denied, and defendant Maryland's motion for summary judgment [45-1] is also denied.

                                                                                       MATTHEW F. KENNELLY
                                                                                       United States District Judge

Date: July 25, 2000